**LAW OFFICE OF ANDREW M. LEAVITT, ESQ.**
Robert F. Purdy (NV Bar No. 6097)
633 South Seventh Street
Las Vegas, NV 89101
Telephone: (702) 382-2800
Facsimile: (702) 382-7438
Robert.purdy@andrewleavittlaw.com

Jonathan M. Shapiro
**AETON LAW PARTNERS LLP**
311 Centerpoint Drive
Middletown, Connecticut 06475
Telephone: (860) 724.2160
jms@aetonlaw.com

**FREED KANNER LONDON & MILLEN LLC**
Matthew W. Ruan (*pro hac vice* forthcoming)
Douglas A. Millen (*pro hac vice* forthcoming)
Michael E. Moskovitz (*pro hac vice* forthcoming)
Nia Barberousse Binns (*pro hac vice* forthcoming)
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com
nbinns@fklmlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*
[Additional counsel listed on signature page.]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| BRIAN COURTMANCHE, LAURA J. FABER, PATRICIA MANCIERI, DAVID SILVER, and JOSSELYN'S GETAWAY LOG CABINS, LLC, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and PIONEER NATURAL RESOURCES COMPANY, | |
| Defendants. | |

1

Plaintiffs Brian Courtmanche, Laura J. Faber, Patricia Mancieri, David Silver and Josselyn's Getaway Log Cabins, LLC (collectively, "Plaintiffs"), individually and on behalf of the Classes defined below, bring this antitrust class action to recover treble damages, injunctive relief, and any other relief as appropriate, based on violations of the Sherman Act and various state antitrust and consumer protection laws by Permian Resources Corporation f/k/a Centennial Resource Development, Inc.; Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; and Pioneer Natural Resources Company (collectively "Defendants"), and allege, upon their personal knowledge as to themselves and each of their own actions, and otherwise upon information and belief, including the investigation of counsel, as follows:

## NATURE OF THE ACTION

1.      This class action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production, which has had the purpose and effect of fixing, raising, and maintaining the price of crude oil—and, as a direct result, the price of home heating oil ("HHO")—in and throughout the United States.

2.      Shale oil, also called "tight oil," is a type of crude oil extracted from sedimentary shale rock formations, typically using unconventional techniques such as horizontal drilling or hydraulic fracturing (or "fracking"). Today, shale oil comprises approximately two-thirds of all crude oil produced onshore in the United States.

3.      Refineries purchase shale oil and other crude oil extracted from traditional drilling methods, co-mingle them, then refine the crude oil into gasoline, diesel, and other petroleum-based products—including HHO. In fact, diesel fuel and HHO are virtually identical in terms of chemical composition, though HHO is dyed red to denote its tax-free status. HHO is then transported by rail or barge from refineries to larger storage facilities, who then transport the HHO to smaller storage tanks for sale to local retail customers who typically have their HHO delivered directly to their home by truck.

4.      HHO is used by approximately 5 million households across the United States—primarily in the Northeast, and to a lesser degree in the South, Midwest, and West—to heat their homes.[1]

---

[1] https://www.eia.gov/energyexplained/heating-oil/use-of-heating-oil.php (last accessed 1/25/24).

1

2         5.     Shale oil is the main input in used in the production of HHO, making it the primary

3  determinant of the price of HHO. Accordingly, a conspiracy to fix the price of crude oil is also a

4  conspiracy to fix the price of HHO.

5         6.     Domestic independent shale oil producers ("independents") are companies that mostly

6  focus on the exploration, development, and production of shale resources in the United States.

7  Independents are distinct from large, vertically integrated energy companies such as ExxonMobil and

8  Chevron (commonly referred to as the "supermajors"), that have diverse global operations encompassing

9  various types of energy sources.

10        7.     Defendants are among the largest independents focusing on domestic shale oil production.

11  Traditionally, they acted as "swing producers" in the global crude oil market because of their ability to

12  quickly adjust shale oil production levels in response to changing market conditions, thus "swinging" the

13  price of crude oil.

14        8.     Following years of relatively lower prices driven by the "U.S. Shale Boom" and increasing

15  volumes and efficiencies in producing shale oil, crude oil prices in the United States began to rise

16  dramatically in January 2021 and continuing to the present.

17        9.     While industry analysts (and basic principles of supply and demand) anticipated that

18  Defendants would increase shale oil production to take advantage of the rising prices, Defendants instead

19  collectively decided *not* to increase their shale oil production. As a result, crude oil prices, and thus HHO

20  prices, have remained high.

21        10.    Defendants' agreement to refrain from increasing their shale oil production was part of a

22  larger agreement with the Organization of the Petroleum Exporting Countries ("OPEC")—the

23  international cartel of the largest oil-producing nations, whose stated purpose is to manipulate global oil

24  prices by coordinating production levels amongst its members.[2]

25        11.    Between at least 2017 and 2023, Defendants and OPEC met and communicated regularly

26  with one another to exchange confidential production and capacity information, and to coordinate their

27  collective crude oil output in response to then-prevailing market conditions. Afterwards, Defendants

28

---

[2] https://www.cfr.org/backgrounder/opec-changing-world (last accessed 1/25/24).

publicly confirmed these meetings and the fact that they and OPEC discussed production strategies, future investment plans, and price targets in unusually candid terms.

12.     For example, one U.S. shale executive—though he or she asked to remain anonymous—nonetheless bragged to Reuters about how, after meeting with OPEC and "having an open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry," that U.S. shale oil producers "***now have a seat the table on [oil] pricing***."[3]

13.     OPEC has been even more brazen. In an official OPEC bulletin issued after OPEC Secretary General Mohammed Barkindo sat on a panel with Defendant Hess Oil's CEO John Hess, Secretary Barkindo wrote: "***We have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views***."[4]

14.     While crude oil supply and prices remained relatively stable prior to the COVID-19 pandemic, demand and prices dropped precipitously at the beginning of the pandemic, only to begin climbing again by early 2021. When Russian invaded Ukraine in February 2022, the supply chain disruption and the loss of crude oil supplied by Russia (who, due to the sanctions imposed upon it by other countries, effectively eliminated its crude oil supplies from the global market) sent prices even higher, creating a ripe environment for swing producers such as the Defendants to quickly increase production and aggressively capture market share.

15.     Instead, the Defendants—in a marked departure from their historical practices and directly contrary to each of their individual, unilateral self-interests—limited their domestic shale oil production growth. But for the conspiracy alleged herein, no economically rational independent would have acted or refused to act in this manner.

---

[3] https://www.reuters.com/article/us-oil-opec-usa-idUSKCN1GB2KP/ (last accessed 1/25/24).
[4] https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html (last accessed 1/25/24).

16.     Defendants' conspiracy, which limited each of their respective shale oil production volumes, had the purpose and effect of fixing, stabilizing, or maintaining crude oil prices—and, in turn, HHO prices— at artificially inflated levels throughout the United States during the Class Period.

17.     The cartel formed by Defendants' conspiracy is a *per se* unlawful restraint of trade under not only federal antitrust law but numerous state antitrust, unfair competition, and consumer protection laws. Plaintiffs and the members of the proposed Classes suffered substantial harm by virtue of the supracompetitive prices they paid for HHO as a direct and proximate result of the cartel and the resulting agreement to constrain domestic shale oil production. Plaintiffs bring this suit to recover those losses and to enjoin Defendants' conduct to hopefully prevent Defendants from harming any other HHO consumers in the future.

## **PARTIES**

18.     Plaintiff Brian Courtmanche is a citizen of Connecticut residing in Madison, Connecticut. Plaintiff Courtmanche purchased home heating oil during the Class Period and paid higher prices for those purchases as a result of the allegations alleged in this Complaint.

19.     Plaintiff Laura J. Faber is a citizen of New York residing in Port Jefferson, New York. Plaintiff Faber purchased home heating oil during the Class Period and paid higher prices for those purchases as a result of the allegations alleged in this Complaint.

20.     Plaintiff Patricia Mancieri is a citizen of Rhode Island residing in Greenville, Rhode Island. Plaintiff Mancieri purchased home heating oil during the Class Period and paid higher prices for those purchases as a result of the allegations alleged in this Complaint.

21.     Plaintiff David Silver is a citizen of Connecticut residing in West Hartford, Connecticut. Plaintiff Silver purchased home heating oil during the Class Period and paid higher prices for those purchases as a result of the allegations alleged in this Complaint.

22.     Plaintiff Josselyn's Getaway Log Cabins, LLC is a New Hampshire limited liability corporation with its principal place of business in  Jefferson, New Hampshire. Plaintiff Josselyn's Getaway Log Cabins, LLC purchased home heating oil during the Class Period and paid higher prices for those purchases as a result of the allegations alleged in this Complaint.

23.    Defendant Permian Resources Corporation ("PRC" or "Centennial") is a Delaware corporation with its principal place of business in Midland, Texas. It was formed in 2022 in a transaction between Colgate Energy Partners III, LLC and Centennial Resource Development, Inc. and, during the Class Period, conducted business and was primarily known as "Centennial." It is a major producer of crude oil from shale oil formations in New Mexico and Texas, which is refined into HHO and sold throughout the United States. PRC's common stock is listed on the New York Stock Exchange under the ticker symbol "PR."

24.    Defendant Chesapeake Energy Corporation ("Chesapeake") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Chesapeake is a major producer of crude oil from shale oil formations, largely in Pennsylvania and Louisiana, which is refined into HHO and sold throughout the United States.  Its common stock is listed on the NASDAQ Stock Market under the ticker symbols "CHK," "CHKEL," "CHKEW," and "CHKEZ."

25.    Defendant Continental Resources Inc. ("Continental") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Continental is a major producer of crude oil from shale oil formations, largely in Oklahoma, Montana, North Dakota, Texas, and Wyoming, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "CLR."

26.    Defendant Diamondback Energy, Inc. ("Diamondback") is a Delaware corporation with its principal place of business in Midland, Texas. Diamondback is a major producer of crude oil from shale oil formations in Texas, which is refined into HHO and sold throughout the United States. Its common stock is listed on the NASDAQ Stock Market under the ticker symbol "FANG."

27.    Defendant EOG Resources, Inc. ("EOG") is a Delaware corporation with its principal place of business in Houston, Texas. EOG is a major producer of crude oil from shale oil formations in Colorado, New Mexico, New York, North Dakota, Oklahoma, Pennsylvania, Texas, and Wyoming, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "EOG."

28.    Defendant Hess Corporation ("Hess") is a Delaware corporation with its principal place of business in New York, New York. Hess is a major producer of crude oil from shale oil formations in

North Dakota, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "HES."

29.    Defendant Occidental Petroleum Corporation ("Occidental") is a Delaware corporation with its principal place of business in Houston, Texas. Occidental is a major producer of crude oil from shale oil formations in Colorado, New Mexico, and Texas, which is refined into HHO and sold throughout the United States. Its common stock and warrants are listed on the New York Stock Exchange under the ticker symbols "OXY" and "OXY WS," respectively.

30.    Defendant Pioneer Natural Resources Company ("Pioneer") is a Delaware corporation with its principal place of business in Irving, Texas. Pioneer is a major producer of crude oil from shale oil formations in Texas, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "PDX."

31.    The term "Defendants," as used herein, refers to and includes each of the named Defendants—Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer—as well as their predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees, officers, or agents. Though each Defendant may have predecessors, successors, parents, subsidiaries and affiliates with distinct corporate forms, each Defendant's officers, employees, and agents routinely refer to the Defendant and its subsidiaries and affiliates collectively without distinguishing amongst their related corporate entities.

32.    Where an action is attributed to "Defendants," unless stated otherwise, that action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer.

## AGENTS AND CO-CONSPIRATORS

33.    Various co-conspirators, some known and some unknown, willingly participated in and acted in furtherance of the alleged conspiracy.

34.    Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

35.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

36.     At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of shale oil production and crude oil, and also HHO, prices.

37.     Whenever reference is made to an act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## JURISDICTION, VENUE, AND COMMERCE

38.     This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), and Section 16 of the Clayton Act (15 U.S.C. §26), as well as the antitrust, unfair competition, and consumer protection laws of various states. The Sherman Act claim is for injunctive relief, costs of suit, and reasonable attorneys' fees; the various state claims seek to recover injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

39.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

40.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiffs are citizens of Connecticut, New Hampshire, New York, and Rhode Island, thus at least one of the Plaintiffs is diverse from at least one of the Defendants, all of whom are either incorporated in Delaware or Oklahoma and whom have their principal places of business in New York, Oklahoma, or Texas.

41.     This Court also has personal jurisdiction over all Defendants, and Venue in this District is proper, under the combination of 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d). A substantial part of the events or omissions giving rise to the claim occurred in this District. On information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

42.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

43.     By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed class members. Defendants, directly and through their agents, engaged in activities affecting all states.

44.     Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the proposed Classes.

**FACTUAL ALLEGATIONS**

A.     **The Organization of the Petroleum Exporting Countries ("OPEC") and Its Historical Control Over Crude Oil Prices.**

45.     OPEC is an intergovernmental organization comprising twelve oil-exporting countries— Algeria, Congo, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Saudi Arabia, United Arab Emirates, and Venezuela—that "coordinates and unifies the petroleum policies of its Member Countries."[5] One of its stated objectives is "to secure fair and stable prices for petroleum producers."[6] In reality, OPEC is an open and notorious cartel that manipulates global oil prices by coordinating production levels amongst its members.[7]

46.     OPEC and its member countries account for 40% of the world's oil production[8] and 80% of its proven current oil reserves.[9]

---

[5] https://www.opec.org/opec_web/en/17.htm (last accessed 1/25/24).
[6] https://www.opec.org/opec_web/en/about_us/24.htm (last accessed 1/25/24).
[7] https://www.cfr.org/backgrounder/opec-changing-world (last accessed 1/25/24).
[8] https://www.eia.gov/finance/markets/crudeoil/supply-opec.php (last accessed 1/25/24).
[9] https://www.opec.org/opec_web/en/data_graphs/330.htm (last accessed 1/25/24).

1
2
3
4
5
6
7
8
9
10
11



12  47.    As a result, OPEC has historically been able to exert market power over global crude oil

13  prices simply by coordinating its members' respective production levels. In addition, non-member

14  nations have also followed OPEC's lead in increasing or decreasing production levels to benefit from the

15  crude oil price targeted by OPEC.

16  48.    Historically, Saudi Arabia has acted as OPEC's, and thus the world's, "swing" producer—

17  *i.e.*, the producer best able to rapidly increase crude oil production levels in response to changing market

18  conditions. This is because Saudi Arabia has generally had the largest production capacity, and it has

19  maintained the largest margin of excess capacity.[10] Thus, Saudi Arabia has traditionally been the world's

20  de facto price leader to whom not only OPEC members, but also non-OPEC members, look for guidance.

21  49.    In late 2016, OPEC expanded its cartel by forming "OPEC+" which included ten

22  additional oil-producing nations—Azerbaijan, Kingdom of Bahrain, Brunei Darussalam, Kazakhstan,

23  Malaysia, Mexico, Sultanate of Oman, the Russian Federation, Republic of Sudan, and Republic of South

24  Sudan.[11] The reasons for this expansion: increases in U.S. crude oil production.

25
26
27  ---
[10] https://www.iea.org/reports/oil-market-report-january-2024# (last accessed 1/25/24).
28  [11] https://www.opec.org/opec_web/static_files_project/media/downloads/publications/Declaration%20of%20Cooperation.pdf (last accessed 1/25/24).

**B.      Fracking, U.S. Shale Oil Production, and a "New Oil Order."**

50.      While the presence of hydrocarbons in shale formations was known for quite some time, it was not until the early 2000s when innovations in horizontal drilling and fracking made it economically viable to substantially increase output from shale and other tight rock formations.[12]

51.      These technologies were first applied to Texas's Barnett shale formation in 2002 with phenomenal success.[13] Predictably, other U.S. companies soon followed suit and, between 2008 and 2015, the U.S. saw its fastest increase in oil production capacity in history, reversing a 35-year trend of declining oil production.[14]

52.      These advancements and the resulting boom in U.S. shale oil production posed a unique problem for OPEC. Unlike traditional drilling projects that required substantial investments of time and money before production would begin but lasted for decades, shale oil wells required smaller capital commitments and became operational in much shorter time frames. This enabled independent U.S. shale oil producers to be more responsive to real-time market conditions and sudden changes in oil prices than the "supermajor" producers using more traditional drilling methods.

53.      As a result, these smaller, independent U.S. shale oil producers had the unprecedented ability to challenge OPEC's stranglehold on crude oil prices because—within months of crude oil reaching economically viable (*i.e.*, "breakeven") price levels—they could ramp up production to take advantage of the higher prices. Thus, these independents could quickly supply the market whenever OPEC implemented production quotas, essentially "free riding" on OPEC's efforts to extract monopoly rents by constraining crude oil supplies.

54.      Moreover, unlike OPEC (who purports to benefit from sovereign immunity to the Sherman Act), these independent shale oil producers are subject to U.S. antitrust laws. Therefore, these relatively smaller crude oil producers—though their combined production levels rivaled some of the larger OPEC member nations—did not have the ability to coordinate production levels and prices like

---

[12] https://www.reuters.com/markets/commodities/is-us-shale-oil-revolution-over-kemp-2022-11-22/ (last accessed 1/25/24).

[13] https://www.dallasfed.org/~/media/documents/research/swe/2010/swe1003c.pdf (last accessed 1/25/24).

[14] https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/ (last accessed 1/25/24).

the OPEC cartel. Instead, these independents were actually forced to compete with one another, resulting in lower prices not only for crude oil, but also derivative petroleum products like HHO.

55.     These events, dubbed "Cowboyistan," ushered in an "American Oil Boom" between approximately 2010 and 2015,[15] and a "new oil order" emerged wherein aggressive competition from independent U.S. shale producers usurped Saudi Arabia's role as the "swing" producer, thus eroding OPEC's cartel set crude oil prices.

**C.     2014-2016: The "OPEC Price War."**

56.     OPEC member nations—whose GDPs and, in some instances, currencies rely heavily on crude oil prices—refused to willingly cede control over global crude oil prices to U.S. shale oil producers. Instead, OPEC decided to leverage its control over the cheapest-to-produce oil in the world to drive the more expensively produced U.S. shale oil out of the market.

57.     Accordingly, in the middle of 2014, OPEC made the strategic, long-term decision to push crude oil prices to a level just low enough to render U.S. shale oil production no longer economically viable while also ensuring its members were satisfied.

58.     This marked the beginning of a two-year period known as the "OPEC Price War" wherein the price of crude oil plummeted as both OPEC member nations and U.S. shale oil producers flooded the market with crude oil at levels not seen in decades.

---

[15] https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/  (last accessed 1/25/24).

Figure 1: Crude Oil Spot Prices (2010 -2016)



59.     During the same period, prices for HHO also plummeted.

Figure 2: No. 2 Heating Oil[16] Prices (2010 – 2016)



60.     Despite OPEC's best efforts to price them into oblivion, U.S. shale oil producers persisted. As crude oil prices dropped, shale oil producers managed to find ways to cut costs and increase productivity, driving breakeven points—*i.e.*, the price at which it still makes sent to continue drilling—lower and lower. At the start of the OPEC Price War, the breakeven point was $82/barrel; by 2018, the breakeven price was $47/barrel; and by 2021, the breakeven price was $37/barrel.[17]

---

[16] No. 2 heating oil is the most common home heating oil and is virtually identical to diesel in chemical composition.
[17] https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand/ (last accessed 1/25/24).

14

61.    By implementing these cost-cutting measures and focusing on the most productive shale oil plays, U.S. shale oil producers were able to remain competitive even in the lower-price environment. Thus, many U.S. shale oil producers—including Defendants—continued to maintain production levels despite the lower prices caused by the OPEC Price War. Knowing that OPEC member nations, whose economies relied heavily on oil revenues, were similarly hurting, U.S. shale oil producers simply waited, ready to pounce whenever prices improved. As Defendant Pioneer's CEO promised, U.S. shale oil producers were poised and ready to respond by ramping up production whenever oil prices moved above $60/barrel.[18]

62.    Nonetheless, some smaller players in the U.S. shale oil industry were driven out of business or merged with larger players. Thus, the OPEC Price War did not kill the U.S. shale oil industry, it simply consolidated it and rallied the survivors behind a shared mission to "hold the line" in the face of a shared adversary.

**D.    Defendants Are Given "A Seat at the Table on Pricing."**

63.    Perhaps seeing the writing on the wall and accepting the fact that its efforts to price U.S. shale oil producers out of the market had failed, OPEC took a new approach.

64.    First, it expanded its reach by adding 10 additional member nations to form "OPEC+." This reduced the number of OPEC's competitors and increased its global market share.

65.    Second, OPEC initiated a multi-year campaign to not only orchestrate a ceasefire, but to bring "Cowboyistan" into the fold and make them members of the cartel.

66.    Luckily for OPEC, U.S. shale oil producers were open to the idea of joining the cartel. For example, as reported by MarketWatch on September 8, 2016, Defendant Continental's CEO, Harold Hamm, said it was "'high time' for Russia and [OPEC] to forge a pact that would put an end to [the] slide in crude oil prices," further adding that "major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later.[19] Such comments were a clear signal that U.S. shale oil producers like Defendant Continental were ready and willing to play ball with OPEC.

---

[18] https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html (last accessed 1/25/24).
[19] https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08 (last accessed 1/25/24).

67.     Shortly thereafter, sometime in early 2017, Defendants and members of OPEC began having meetings and dinners together, including at industry meetings such as the  CERAWeek Conference, an energy-focused event held annually in Houston, Texas.[20]

68.     During that 2017 CERAWeek Conference, which was held March 6-10, "[OPEC's General Secretary Mohammed] Barkindo dined with about two dozen U.S. shale executives," including at least  Scott Sheffield of Defendant Pioneer, John Hess of Defendant Hess, Doug Lawler of Defendant Chesapeake, and Tim Leach of Concho Resources Inc.[21] "The unusual 2017 dinner gathering opened a communication channel between the shale companies and OPEC countries."[22]

69.     Right around that same time, on March 7, 2017, Scott Sheffield of Defendant Pioneer told Bloomberg that, I'm seeing a series of meetings where OPEC is reaching out and spending more time with U.S. independents than I've seen over my entire career. I think the new thought process within OPEC is that there are other places around the world that can supply crude around the world, and they want to definitely have an understanding of how fast it can come on."[23] He further admitted to attending what was described as a "Dinner Détente" and while he couldn't discuss what was said over that dinner, he did say that "[OPEC's] trying to understand our business model" and "I think they're trying to understand more about our ability to produce, what the cost structure is and what's going to happen over the next several years."[24] Sheffield added that, "[i]n return, shale producers are talking with OPEC to learn about the members' thought process towards the price of oil over the next several years, what supplies the different members have themselves, and whether inventories are falling."[25] According to Sheffield, "[this] helps us plan long term."[26]

---

[20] https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10/ (last accessed 1/25/24).
[21] https://www.worldoil.com/news/2018/2/27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week/ (last accessed 1/25/24).
[22] *Id*.
[23] https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts (last accessed 1/25/24).
[24] *Id*.
[25] *Id*.
[26] *Id*.

70.     In another article describing that same dinner meeting, it was reported that, according to the attendees, "[t]he sides agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone."[27] Attendees further said that "while the shale producers signaled they weren't ready to give up on the growth they see ahead, OPEC indicated it wants higher prices, even if it means enriching the shale companies."[28] According to Defendant Hess's CEO, "It was a very good exchange of information and views about oil. … It was a good talk."[29]

71.     Thus, as the participants of this meeting readily acknowledged, U.S. shale oil producers— including some if not all of the Defendants—not only shared competitively sensitive, forward-looking information concerning both production levels and pricing with OPEC, but they expressly agreed to reduce crude oil supplies.

72.     Shortly after the CERAWeek meeting, Saudi Arabia's Energy Minister Khalid Al-Falih warned U.S. shale oil producers that if they wanted to collaborate, there would be no "free rides" on OPEC production cuts, and they must instead be ready to pull their weight when the time comes.[30] Put another way, OPEC told U.S. shale producers that OPEC expected them to work together and coordinate their production cuts alongside OPEC.

73.     Later that year, OPEC Secretary General Barkindo told reporters that U.S. shale oil producers were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[31]  Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[32]

74.     In March 2018, the following year's CERAWeek Conference was held. Prior to that conference, OPEC Secretary General Barkindo, discussing another scheduled dinner with U.S. shale

---

[27] https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente (last accessed 1/25/24).
[28] *Id.*
[29] *Id.*
[30] https://www.reuters.com/article/idUSKBN16G2TQ/ (last accessed 1/25/24).
[31] https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a (last accessed 1/25/24).
[32] *Id.*

producers, explained "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[33] He said the dinner was arranged to "further explore the mechanic of achieving our common objective."[34]

75.    That dinner took place on March 5, 2018 at the Grove restaurant in Houston, Texas.[35] During that dinner, OPEC Secretary General Barkindo gave a speech that Defendant Pioneer's CEO, Time Dove, later described as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth."[36] Defendant Centennial's CEO, Mark Papa, characterized the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[37]

76.    OPEC representatives similarly described the dinner as an exchange of forward-looking information. For example, OPEC Secretary General Barkindo reported that he and U.S. shale oil executives "had a very open, frank and lively conversations on a current state of the cycle and we also compared note[s] from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they have shown in continuing this energy dialogue."[38]

77.    Similarly, Equatorial Guinea's petroleum minister, Gabriel Mgaga Obiang Lima, told reporters: "The key thing is that information is shared about our projections; it really helps everybody…the important thing is to know how much they [U.S. shale oil producers] are investing and their projections because usually they have good statistics."[39] Lima then revealed the true purpose behind

---

[33] https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week (last accessed 1/25/24).
[34] *Id.*
[35] https://www.reuters.com/article/us-ceraweek-energy-opec-shale-idUSKCN1GJ04H/ (last accessed 1/25/24).
[36] *Id.*
[37] *Id.*
[38] https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf (last accessed 1/25/24).
[39] https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html (last accessed 1/25/24).

this information exchange: "What we are doing is avoiding volatility," he said—or, put differently, stabilizing prices by coordinating production.[40]

78.    As the CEO of one U.S. shale oil producer who declined to be identified by name told reporters, "Shale has dramatically changed the world's perception of fossil fuels," further adding: "We now have a seat at the table on pricing."[41]

79.    Now that Defendants "had a seat at the table," they began taking a more conciliatory approach with OPEC. Defendant Continental's CEO, Harold Hamm, attended a board meeting of Saudi Aramco (the oil producer controlled by Saudi Arabia, OPEC's largest member), agreed to speak at an OPEC event, and reportedly began "asking fellow shale producers to focus more on profitability and less on profligate production."[42]

80.    In June 2018, OPEC Secretary General Barkindo invited U.S. shale officials to join him at the OPEC International Seminar in Vienna, Austria. Executives from at least two Defendants attended the event—Defendant Pioneer's Scott Sheffield and Defendant Hess's John Hess—during which Sheffield stated: "OPEC should boost daily output by roughly 1 million barrels over time" and "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[43] Sheffield then added: "OPEC needs to fulfill its duty."[44]

81.    In connection with the same OPEC summit, Defendants publicly admitted—perhaps for the first time—to actively participating, rather than merely listening, during their meetings with OPEC. Defendant Pioneer's Sheffield admitted to discussing crude oil supplies and their effect on global prices: "My message yesterday as I spoke to the [OPEC] panel was that it's important that OPEC increases production somewhat to make up for the different. If they don't we are going to see $100 oil or higher."[45]

---

[40] *Id.*
[41] https://www.reuters.com/article/us-oil-opec-usa-idUSKCN1GB2KP/ (last accessed 1/25/24).
[42] https://www.reuters.com/article/us-oil-opec-contl-resources-idUSKBN1JE1VW/ (last accessed 1/25/24).
[43] https://www.reuters.com/article/idUSKBN1JG2OA/ (last accessed 1/25/24).
[44] *Id.*
[45] https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video (last accessed 1/25/24).

82.     Sheffield's message was apparently received loud and clear, and he received a return response: two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[46]

83.     In January 2019, OPEC's Secretary General Barkindo, Defendant Hess's CEO John Hess, and Defendant Occidental's CEO Vicki Hollub sat together on a panel at the Davos World Economic Forum where it was reported that both Hess and Hollub "said that growth of U.S. shale oil output would slow" in the near future and Barkindo, in turn, expressed a desire "to talk more regularly to U.S. producers to understand their industry better even if they could not participate in any OPEC-led production cuts."[47]

84.     Hess responded by saying "OPEC plays a very important role in stabilizing the market and those efforts need to be recognized," to which Barkindo responded: "We have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views."[48]

85.     That same month, OPEC+ began new production cuts, agreeing to reduce supply by 1.2 million barrels per day over the next six months.[49] After those cuts were announced, it was reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[50]

86.     In March 2019, U.S. shale oil executives (including at least some of the Defendants) and OPEC met at CERAWeek. Bloomberg reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[51]

87.     Once again, U.S. shale oil executives—including at least Defendant Diamondback's CEO Travis Stice, Defendant Centennial's CEO Mark Papa, and Defendant Occidental's CEO Vicki Hollub—

---

[46] *Id*; https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/ (last accessed 1/25/24).
[47] https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG/ (last accessed 1/25/24).
[48] https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html (last accessed 1/25/24).
[49] https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD/ (last accessed 1/25/24).
[50] https://www.reuters.com/article/idUSL1N1YC20I/ (last accessed 1/25/24).
[51] https://www.bloomberg.com/news/articles/2019-03-11/venezuelan-oil-output-is-plunging-iea-says-ceraweek-update (last accessed 1/25/24).

met with OPEC's Secretary General Barkindo for a dinner meeting during that CERAWeek conference.[52] Barkindo described the dinner as a "friendly conversation on current industry issues and the immediate prospects and challenges for all," while Stice told reports that OPEC and Defendants had "a very good session" which included "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[53]

### E.    2021: Defendants Agree to Cut Production of Shale Oil.

88.    Despite the increase in communications and information exchanges, it is not clear when precisely Defendants began coordinating output in conjunction with OPEC. Through the end of 2018, it at least ostensibly appears as if Defendants were not ready to slow their growth and cut back production.

Figure 3: Change in Crude Oil Production (2014 – 2019)[54]



Source: U.S. Energy Information Administration

[52] https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year (last accessed 1/25/24).
[53] *Id.*
[54] https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826 (last accessed 1/25/24).

89.     According to industry analyst projections, 2019 would bring "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output [wa]s expected to grow by 1.4. million barrels a day [in 2019], to average 12.4 million barrels a day."[55] But that second wave never came.

90.     In 2020, COVID-19 lockdowns drove demand for crude oil down to never-seen-before lows. Following months of economic turmoil, in July 2020, OPEC's Secretary General communicated clearly and unequivocally that OPEC could inflate and sustain crude prices if Defendants cooperated:

> We were able to reach out to the U.S. independents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. Everybody has a role to play. We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.[56]

91.     On November 28, 2020, Defendant EOG's CEO Bill Thomas signaled the industry's willingness to follow OPEC's lead on pricing and not to respond by increasing production:

> In the future, certainly we believe OPEC will be the swing producer—really, totally in control of oil prices.
>
> We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices.[57]

92.     In early 2021, as the world began slowly emerging from the pandemic, demand for crude oil surged, causing prices to rise to nearly $70/barrel in March 2021. To prop up prices even higher, OPEC and OPEC+ countries purposely and collectively withheld production of crude oil.[58]

93.     Defendants stayed true to their word and responded by also withholding production. Suddenly and nearly in unison they not only slowed down their own production, but began making public statements touting the need for supply "discipline." Throughout 2021, Defendants consistently signaled

---

[55] *Id.*
[56] https://www.ogj.com/general-interest/article/14179258/opec-secretary-general-no-objective-to-drive-us-shale-out-of-business (last accessed 1/25/24).
[57] https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands (last accessed 1/25/24).
[58] https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html (last accessed 1/25/24).

to each other and to OPEC that they were no longer competing for market share and would not act as swing producers:

(a) February 2021: Defendant Chesapeake's CEO Doug Lawler announced that U.S. shale oil producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[59] Defendant Pioneer's CEO Scott Sheffield agreed and predicted that small companies—i.e., those not included in discussions with OPEC—would increase output to meet rising prices, but that major producers would not such that, in the aggregate, U.S. output would "remain flat to 1% higher" even if crude prices exceeded $60 per barrel, a level at which a market observer noted "any oil production is profitable, especially the relatively high-cost U.S. shale patch."[60]

(b) March 2021: On the same day OPEC publicly announced it would be restricting supply, Defendant Occidental's CEO Vicki Hollub said that despite a "healthier supply and demand environment" and a "V-shaped" post-pandemic recovery, U.S. oil production would not resume to pre-pandemic levels because Defendants and other U.S. shale oil producers were now "committed to value growth, rather than production growth."[61]

(c) April 2021: Defendant Pioneer's CEO Scott Sheffield signals his company and other U.S. producers would not meet rising prices by increasing supply: "OPEC and Russia were upset that we grew too much," he said.[62] "If we ever start growing again too much, we're going to have another price war."[63]    That was why he was "totally against" an EIA forecast that

---

[59] https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/ (last accessed 1/25/24).
[60] *Id.*
[61] https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html (last accessed 1/25/24).
[62] https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/ (last accessed 1/25/24).
[63] *Id.*

23

predicted substantial production growth, because "producers now know the stakes and will stick to their mantra of capital discipline."[64]

(d) June 2021: In an interview with Reuters, Defendant Pioneer's CEO Scott Sheffield said that he was "confident the producers will not respond" the high crude oil prices by increasing production because they were focused on "shareholder returns."[65] It was further reported that "[i]n the United States, closely held companies have contributed substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[66]

(e) August 2021: On an earnings call, Defendant EOG's President and CEO Bill Thomas—echoing Defendant Chesapeake's CEO Lawler's language from earlier in the year, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started. I think OPEC+ is solid. I think the U.S. will remain disciplines. And so, I think the industry is in for a long run of really good results."[67]

(f) October 2021: Defendant Pioneer's CEO Scott Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control," reflecting Defendants' production restraint agreement.[68] Sheffield reaffirmed Defendant Pioneer's commitment to the conspiracy, promising to cap any Pioneer output increase at 5% per year regardless of the price of crude oil, explaining

---

[64] *Id.*

[65] https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/ (last accessed 1/25/24).

[66] *Id.*

[67] https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/ (last accessed 1/25/24).

[68] https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05 (last accessed 1/25/24).

1    "everybody's going to be disciplined, regardless whether it's $75 Brent, $80

2    Brent, or $100 Brent."[69]

3    94.    Considering that breakeven prices for U.S. shale oil production at that time were

4    approximately $40 per barrel, Defendants' "discipline" and "restraint" raised eyebrows amongst industry

5    analysts:

6    (a) January 2021: Reuters reports that "U.S. shale producers are keeping their

7    pledges to hold the line on spending and keep output flat, a departure from

8    previous boom cycles."[70] The reporter noted that the recent "run up in crude

9    prices, and oil output curbs imposed by the OPEC+ producers group,

10   historically would have triggered a drilling boom."[71]

11   (b) June 2021: A Reuters columnist notes that "U.S. shale producers have

12   normally captured market share from OPEC+ whenever prices have been

13   above $55-60 per barrel."[72] However, Defendants' output restraints have

14   "emboldened OPEC+ to maintain its own output curbs, temporarily

15   removing the threat of lost market share and accelerating the upward

16   pressure on prices. Shale producers have publicly reiterated their new

17   commitment to output restraint in interviews as well as calls with analysts

18   and investors."[73] The author further notes that "there is a broad consensus

19   among OPEC+ countries and the U.S. shale industry on the need for slower

20   output growth, higher prices, and wider profit margins."[74]

21   (c) February 2022: On Defendant Chesapeake's Q4 2021 earnings call, Bank

22   of America Managing Director and Head of U.S. Oil and Gas challenged

23   Defendant Chesapeake's CEO regarding its plans to slow production,

---

24   [69] *Id.*

25   [70] https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/ (last accessed 1/25/24).

26   [71] *Id.*

27   [72] https://www.reuters.com/business/energy/us-shale-restraint-pushes-oil-prices-multi-year-high-kemp-2021-06-04/ (last accessed 1/25/24).

      [73] *Id.*

28   [74] *Id.*

calling it "the easiest way to destroy value" for the company in the long term."[75]

95.     But OPEC knew precisely what was happening. In early 2021, OPEC "predicted" a significant annual drop in U.S. shale production and Reuters reported that anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[76] OPEC Secretary General Barkindo similarly signaled that the price war was over, stating: "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that independents and OPEC "have a shared responsibility in this regard."[77]

### F.     2022-2023: Defendants, Again Contrary to Their Unilateral Self Interest, Continue to Refuse to Increase Supply and Capture Market Share.

96.     In 2022, following Russia's invasion of Ukraine, crude oil prices surged dramatically. Unlike the dramatic drop in demand caused by the COVID-19 pandemic, this was a supply-side phenomenon precipitated by a sudden decrease in the volume of available oil in the U.S. market as a result of both supply chain disruptions and Russia's oil production being unavailable to the world market.

97.     By the middle of that year, the price of oil rose above $120 per barrel—an amount nearly four times larger than the low water mark reached during the OPEC Price War in 2016.

98.     In response to the possibility that higher prices might recede, OPEC further cut production even further, including cuts in October 2022 of two million barrels per day. OPEC announced these cuts just as crude oil prices began to normalize, indicating that they were designed to "stabilize the recent fall in global energy prices."[78]

99.     Despite the fact that 2022 saw record high prices that remained high throughout 2023, Defendants continued to act against their rational economic self-interest by withholding production:

---

[75] https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nick-dellosso-on-q4-2021-results-earnings-call (last accessed 1/25/24).
[76] https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/ (last accessed 1/25/24).
[77] *Id.*
[78] https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/ (last accessed 1/25/24).

(a) February 2022: While the massing of Russian troops on Ukraine's borders was making headlines, Defendant Pioneer's CEO Scott Sheffield publicly states: In regards to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] independents are staying in line," and "I'm confident they will continue to stay in line."[79] He tells one reporter during an interview on Bloomberg television: "Whether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans."[80]

(b) February 2022: That same week, Defendant Continental's CEO Bill Berry says on the company's Q4 earnings call that "[w]e project generating flat to 5% annual production growth over the next five years as we have previously noted."[81]

(c) February 2022: Bloomberg reports that "[Defendant]EOG Resources Inc. plans to restrain oil growth despite surging prices, falling into line with most other major U.S. independent shale producers…like [Defendant] Pioneer National Resources and [Defendant] Continental Resources[, what] are also limiting increases to 5% this year."[82]

(d) March 2022: Defendant Occidental's CEO Vicki Hollub touts its "huge inventory of high-quality investments" but further states that the company is not acting on those investments because it is "instead focused on maintaining high profits."[83]

(e) August 2022: During an earnings call, Defendant EOG states that even though the economic conditions are ripe for a production increase the

---

[79] https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html (last accessed 1/25/24).
[80] *Id.*
[81] *Id.*
[82] https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers (last accessed 1/25/24).
[83] https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html (last accessed 1/25/24).

company intends to limit its 2023 production growth to "low single digits" because it is "committed to remaining disciplined."[84]

(f) January 2023: Defendant Pioneer's Scott Sheffield states that the "aggressive growth era of US shale is over" and that Defendant Pioneer and the other Defendants are "no longer a swing producer."[85]

(g) February 2023: Defendant Diamondback's CEO Travis Stice asserts, "we have no reason to put growth before returns…we will continue to be disciplined."[86]

(h) March 2023: When asked in an interview why Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's CEO Vicki Hollub replies that "prices are in a good place right now" and that Occidental has no intention of increasing production to meet global demand and lower U.S. gas prices, despite having the ability to profitably increase production."[87]

100.    Within this context of high crude prices and ever-lowering breakeven prices for Defendants, industry journalists and analysts continued to express their disbelief that Defendants refused to compete for market share:

(a) February 2022: According to the Washington Post, the crude oil price increases following Russia's invasion of Ukraine are a "clear signal to raise [shale oil] production; we're talking Bat-signal clarity here."[88]

(b) February 2022: A Bloomberg article asks why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale

---

[84] https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05/ (last accessed 1/25/24).

[85] https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1 (last accessed 1/25/24).

[86] https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22 (last accessed 1/25/24).

[87] https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html (last accessed 1/25/24).

[88] https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war (last accessed 1/25/24).

fields," and notes that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[89]

(c) March 2022: A CNBC anchor observes: "I know we keep hearing about this key code word from all the oil companies right now that they are 'disciplined,' but when you see oil north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[90]

(d) April 2023: Following additional production reductions by OPEC, Bloomberg reports that the U.S. shale industry does not plan to "break a three-year trend" by increasing production in response to rising oil prices, and will not "rescue" U.S. consumers from high gas prices, despite being "flush with case after record profits," because, according to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[91]

101.    Throughout 2022 and 2023, Defendants and OPEC continued to meet and communicate with one another.

(a) March 2022: Defendants again meet with OPE during CERAWeek in Houston, Texas. As observed by Reuters, Defendants and OPEC had "found themselves on similar sides as oil prices have surged well above $100 a barrel: no rush to rapidly boost production."[92]

(b) March 2023: FT reports that U.S. shale executives, including at least Defendant Pioneer's Scott Sheffield, Defendant Chesapeake's Nick

---

[89] https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers (last accessed 1/25/24).

[90] https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html (last accessed 1/25/24).

[91] https://www.bnnbloomberg.ca/don-t-expect-us-shale-to-quickly-fill-the-gap-left-by-opec-cut-1.1903965 (last accessed 1/25/24).

[92] https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10/ (last accessed 1/25/24).

Dell'Osso, Defendant Diamondback's Travis Stice, Defendant Occidental's Vicki Hollub, and Defendant Hess's John Hess met with OPEC Secretary General-elect Haitham Al Ghais for a private sinner in a Houston restaurant wherein the attendees reaffirmed their agreement to restrict production, "[d]espite recent record profits."[93]

102.    In case there was any room for doubt, Defendants made it abundantly clear in early 2023 that they were coordinating with OPEC.

103.    On January 5, 2023, Defendant Pioneer's CEO Scott Sheffield claimed that "OPEC ministers are frustrated over the recent price fall," later predicting that upcoming production was "going to change…. If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut…. [W]e'll see that happens in the next 90 days."[94] A little less than three months later, OPEC "shocked traders around the world" by announcing a "surprise" production cut whereas OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[95]

104.    On March 27, 2023, in between Sheffield's prediction and OPEC's surprise announcement, it was reported that some Defendants—including at least Defendant Pioneer and Defendant EOG—had pulled back hedge positions they had previously taken to protect downward oil price movements, leaving those Defendants "suddenly vulnerable" and exposing them to massive financial risk if oil prices declined.[96] Defendant Pioneer's CEO Sheffield doubled-down stating "we're not going to hedge" and proclaiming he was "optimistic that we'll see $100 a barrel before the end of the year."[97]

105.    In light of OPEC's surprise announcement less than a week later, the only plausible and reasonable explanation for Defendants' failure to hedge is that they had advance notice of OPEC's intentions to cut crude oil production.

---

[93] https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9 (last accessed 1/25/24).
[94] https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut (last accessed 1/25/24).
[95] https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd (last accessed 1/25/24).
[96] https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143 (last accessed 1/25/24).
[97] *Id.*

106.    In April 2023, one energy industry analyst aptly summarized the impact of Defendants'
agreement to constrain crude oil production:

> In its early days, shale behaved like a dimmer, with output growth accelerating
> proportionally as oil prices were dialed up. That ability to respond quickly to the
> market was due to the speed at which shale wells could be developed: a few months
> compared to the years or decades of Big Oil projects. Today, shale is as responsive
> as in the past. But there's a difference. **The dimmer appears to be capped at a
> certain level: No matter how high oil prices go above that level – say $100 a
> barrel – the industry will no longer add rigs to sop up market share**. Rather, it
> will stay put and go into harvest mode with existing wells – that's exactly what
> happened in 2022, much to the consternation of the White House, which urged shale
> companies to drill more.[98]

107.    As demonstrated by Defendants' prior role as swing producers, Defendants were capable
of increasing crude oil production and growing their market share; they simply chose not to. Why they
made that choice can only be explained by the existence of the conspiracy alleged herein.

108.    Defendants' agreement to constrain U.S. shale oil production achieved is intended and
desired effect—*i.e.*, artificially inflating domestic crude oil prices and the enjoyment of massive revenue
increases without the need to invest in new production or otherwise increase supply.

### G.    Defendants' "Restraint" Is Economically Irrational Absent Collusion.

109.    Defendants employed a variety of terms and phrases which they employed as code to
disguise their mutual agreement to coordinate and restrain domestic shale oil production—"disciplined,"
focus on "value growth," or "staying in line," or operating for "shareholder returns." Defendants'
repeated public confirmation of their production discipline revealed that they each in fact had additional
production capacity that they simply chose to leave untouched.

110.    In a competitive market, when prices are higher than a firm's marginal costs, the firm will
increases its supply to the point where the market price equals the marginal cost of producing an
additional unit of supply (accounting for an economic profit). With oil prices far above each Defendant's
"break-even" point, each Defendant had enormous incentives to pursue additional production because,
in a competitive market, firms that decline profitable opportunities lose them to competitors.

---

[98] https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off (last accessed 1/25/24).

111.    In that situation, expanding production to take advantage of prices above your breakeven is the economically rational response. If you do not expand production, your competitor will, taking margin share and reinvesting their additional profits into further productive capacity and/or efficiency gains. Defendants taught OPEC this very lesson during the Shale Revolution and the ensuing OPEC Price War.

112.    The only economically rational reason any Defendant would choose not to increase production is if that Defendant knew the others would also decline to increase production, and that enough of the crude oil market would exercise similar restraint that it would not significantly affect the Defendants' market share. Individually, no U.S. shale oil producer had market power sufficient to constrain overall U.S. shale oil outputs in any meaningful way, let alone global outputs. However, together Defendants had substantial power in the U.S. market—especially with respect to the swing production that mattered most to global prices. Together, the Defendants could substantially constrain that portion of U.S. oil production most important to the global price of oil and, as a result, they could exercise their power to negotiate cartel supply restrictions with OPEC and insure themselves against competition from other major swing producers.

113.    In fact, the supermajors and many smaller independent producers did respond to these individual incentives, though practical limitations on their ability to respond quickly limited their effect. Supermajors have historically refrained from investing in fracking, viewing them as a smaller-scale enterprise difficult to integrate into their very large-scale institutions. Yet in 2021 and 2022, directly responding to U.S. shale producers' "underinvesting as an industry," the supermajors began investing in shale at unprecedented rates.

114.    In 2022, both ExxonMobil and Chevron planned on increasing its production level in the Permian Basin by 25% and 10%, respectively. Mid-way through 2022, Chevron anticipated a 15% year-over-year increase in shale oil production compared to 2021.

115.    In May 2023, ExxonMobil CEO Darren Woods revealed that the company intended to use new technologies aimed at doubling the volume of oil produced from U.S, shale holdings over a five-year timeframe.

116.    Smaller, private shale companies took advantage of the high prices and drilled furiously. Benefiting from the production gap left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[99] As one example, according to Reuters, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[100]

117.    But small shale oil producers are limited in how fast they can add supply and increase production because they lack economies of scale, have less capital, less access to limiting resources like drilling rigs, and are less able to scale up and operate multiple drilling projects simultaneously.

118.    Compounding matters, Defendants are able to leverage their collective market share because the U.S. shale oil industry is so highly fragmented: of the roughly 250 companies operating oil rigs in the U.S., approximately 2/3 are operating just one oil rig.

119.    In addition, conventional oil production in the U.S. is largely fixed and cannot quickly increase or decrease production in response to changing market dynamics in the short- to medium-term.

120.    When Defendants' production and capacity are combined with that of the OPEC and OPEC+ member countries, the resulting cartel formed by these entities controls approximately 60% of the total global oil production and nearly all total global oil production capable of quickly responding to sudden price variations on a short-term basis.

## **PLUS FACTORS**

121.    In addition to Defendants' and OPEC's statements quoted above, the existence of the conspiracy alleged herein is supported by "plus factors" that plausibly support the reasonable inference that Defendants' actions are the product of collusion and not pro-competitive, unilateral conduct.

122.    The U.S. shale oil industry is highly susceptible to collusion because:

   (a)  it is highly fragmented, with a small number of larger producers with excess

        capacity and numerous smaller producers;

---

[99] https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/ (last accessed 1/25/24).

[100] *Id.*

(b) there are significant opportunities to collude, coordinate supply restraints, and police cheating as a result of the trade associations that Defendants regularly participate in;

(c) shale oil is a commodity, thus facilitating price-fixing negotiations amongst entities that would otherwise be competitors;

(d) shale oil's downstream products, including HHO, are daily-use commodities for which there are no reasonable substitutes and/or high switching costs, leading to highly inelastic demand which enables producer cartels to extract monopoly rents from consumers who are unable to avoid price increases; and

(e) thanks to OPEC and OPEC+, the majority of the oil market is already explicitly cartelized.

123. Defendants' actions during the Class Period were against each of the Defendant's unilateral self-interest insofar as no rational economic actor facing the strong individual incentives to increase their shale oil production and capture market share would forego such opportunities unless those actors knew in advance that the other producers had already committed to similarly constrain production and create artificially high price levels.

124. In addition, Defendants' decisions not to increase production were made in an environment where Defendants regularly met with one another and with OPEC, wherein they discussed their confidential business plans (including forward-looking production and capacity information) in a manner that would be economically irrational absent the alleged conspiracy.

## ANTITRUST INJURY

**A.    Defendants' Conspiracy Has Inflated the Price of Crude Oil Throughout the Class Period.**

125. The effect of U.S. shale oil production on crude oil prices, and thus HHO prices, is widely recognized by economists and market analysts. For example:

a) In a 2017 article in the ECB Economic Bulletin, economists Irma Alonso Álvarez and Virginia Di Nino concluded that "OPEC's production decisions

34

during the shale oil age…have been particularly influenced by the evolving supply conditions in the United States," because U.S. shale oil increased global crude oil supply.[101]

b) In a June 2019 Forbes article it was reported that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because, since 2008, "global oil production has increased by 11.6 million BPD" while "U.S. oil production increased by 8.5 million BPD -- equal to 73.2% of the global increase in production."[102]

c) In an October 2019 report by the Executive Office of the President of the United States, Council of Economic Advisers, it was found that "[U.S.] Shale production has also reduced the global price of oil by 10 percent as of 2019."[103]

d) In a June 2020 working paper by the Federal Reserve Bank of Dallas, economists Nathan S. Balke, Xin Jin, and Mine Yücel found "that if the shale revolution had not happened, the price of oil would have been 36% higher and global output 5.8% lower by the end of 2018."[104]

e) In a July 2023 article in the International Journal of Energy Economics and Policy, economist Maitham A. Rodhan wrote that "increases in US shale oil production had significant impacts domestically and internationally. … At the international level, it significantly increased oil supply, directly affecting the price of crude oil… ."[105]

126. Defendants wield this power over crude oil prices because of their roles as swing producers in the global crude oil market—*i.e.*, they have sufficient market power to dictate when the

---

[101] https://www.ecb.europa.eu/pub/pdf/other/ebart201708_01.en.pdf (last accessed 1/25/24).

[102] https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=209c26df5125 (last accessed 1/25/24).

[103] https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf (last accessed 1/25/24).

[104] https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf (last accessed 1/25/24).

[105] https://econjournals.com/index.php/ijeep/article/view/14455/7412 (last accessed 1/25/24).

United States can and will produce sufficient quantities of shale oil to "swing" the crude oil market and drive prices down.

127.    Defendants openly acknowledge that they wield this power, although they publicly claim that they choose not to use it. In March 2022, the New York Times reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices… ."[106]

128.    Since at least January 1, 2021, despite high crude oil prices and healthy global demand, Defendants have coordinated their production decisions, leading to lower growth rates than would otherwise have been experienced in a market free from such anticompetitive forces.

129.    Despite shale oil production increases by some non-conspirators, Defendants' production restraints has dramatically impacted total U.S. shale oil production. In 2022, U.S. shale oil production increased by 500,000 barrels, a benchmark 50% lower that some market analysts had estimated.[107]

130.    The gap between the amount of U.S. shale oil that was *actually* produced and the amount of U.S. shale oil that *would have been produced* but for Defendants' conspiracy led to artificially inflated prices for crude oil which, in turn (as discussed below), led to higher HHO prices paid by Plaintiffs and the members of the Proposed Class.

**B.    Defendants' Conspiracy Has Inflated the Price of HHO Purchased by Plaintiffs and the Members of the Proposed Classes.**

131.    Most HHO is supplied by domestic refineries who send HHO to storage terminals for distribution to consumers.[108] Transport is generally provided by rail or barge to larger storage facilities, and from those larger storage facilities it is transported by truck to smaller storage tanks for sale to local retail customers, who typically have their HHO delivered directly to their home.[109]

---

[106] https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html (last accessed 1/25/24).
[107] https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html (last accessed 1/25/24).
[108] https://www.eia.gov/energyexplained/heating-oil/where-our-heating-oil-comes-from.php (last accessed 1/25/24).
[109] *Id.*

132.    According to the U.S. Energy Information Administration ("EIA"), "[n]early all of the heating oil consumed in the United States is produced from crude oil."[110] Accordingly, the cost of crude oil accounts for just under half the average price of HHO and is one of the primary drivers of HHO prices.[111, 112] As noted by one website, "[h]eating oil is derived from crude oil, so the price of crude oil has a major effect on the price of heating oil."[113]

133.    Not surprisingly, as demonstrated by the Figure 4 below, prices paid for HHO by consumers closely mirror the prices both for crude oil and gasoline sold in the United States.

Figure 4: HHO vs. Gasoline vs. Crude Oil Spot Prices



134.    As the above allegations demonstrate, the price of crude oil has a direct effect on the price of HHO. This is because crude oil is the primary raw material used to produce the HHO sold throughout the United States. As a result, Defendants' conspiracy not only inflated the price of crude oil, it also

---

[110] https://www.eia.gov/energyexplained/heating-oil/ (last accessed 1/25/24).
[111] https://www.eia.gov/energyexplained/heating-oil/prices-and-outlook.php (last accessed 1/25/24).
[112] https://www.eia.gov/energyexplained/heating-oil/factors-affecting-heating-oil-prices.php (last accessed 1/25/24).
[113] https://commodity.com/energy/heating-oil/ (last accessed 1/25/24).

inflated the price of HHO sold in the United States during the Class Period, which in turn affected HHO purchasers like Plaintiffs and the members of the proposed Classes who purchased HHO at these artificially inflated prices.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2) on behalf of themselves and as representatives of a class of indirect purchasers seeking injunctive relief (the "Nationwide Injunctive Relief Class") defined as follows:

> All persons or entities who purchased home heating oil in the United States from January 1, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

136.    In addition, Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all others similarly situated seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All persons or entities who purchased home heating oil in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont from January 1, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

137.    Specifically excluded from both the Nationwide Injunctive Relief Class and the State Law Class are: Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his or her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

138.    Plaintiffs reserve the right to modify these definitions and/or to propose subclasses, as appropriate, based on further investigation and discovery.

139.    <u>Numerosity</u>. The members of the Nationwide Injunctive Relief Class and the State Law Class are so numerous that joinder of all members would be impracticable. The exact number of members in the Nationwide Injunctive Relief Class and the State Law Class is unknown to Plaintiffs at this time,

but it is estimated to number in the millions. The members of the Nationwide Injunctive Relief Class and the State Law Class should be readily identifiable from existing records.

140.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the members of the Nationwide Injunctive Relief Class and the State Law Class because they were all similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for HHO sold in the United States, resulting from Defendants' conspiracy to fix prices in the crude oil market.

141.    <u>Adequacy</u>. Plaintiffs will fairly and adequately represent the interests of the members of the Nationwide Injunctive Relief Class and the State Law Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other class members. Plaintiffs are represented by attorneys experienced in the prosecution of class action litigation generally, and in antitrust litigation specifically, who will vigorously prosecute this action on behalf of the Nationwide Injunctive Relief Class and the State Law Class.

142.    <u>Common Questions of Law and Fact Predominate</u>. Questions of law and fact common to the members of the Nationwide Injunctive Relief Class and the State Law Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to all class members. Common issues of fact and law include, but are not limited to, the following:

(a)    whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or HHO in the United States;

(b)    the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(c)    whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

(d)    whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs and other members of the Nationwide Injunctive Relief Class or the State Law Class;

(e) whether Defendants caused Plaintiffs and the members of the Nationwide Injunctive Relief Class and/or the State Law Class to suffer damages in the form of overcharges on HHO;

(f) the effect of Defendants' conspiracy on the HHO prices sold in the United States during the Class Period;

(g) the appropriate measure of class-wide damages for both the Nationwide Injunctive Relief Class and the State Law Class; and

(h) the nature of appropriate injunctive relief to restore competition int the U.S. market for HHO.

143.    Superiority. A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons a method for obtaining redress on claims that could not practicably be pursued individually. Moreover, the prosecution of separate actions by individual members of the Nationwide Injunctive Relief Class or the State Law Class would create a risk of inconsistent or varying adjudications, potentially establishing incompatible standards of conduct for Defendants. Plaintiffs know of no manageability or other issue that would preclude maintenance of this case as a class action.

144.    Injunctive relief. Defendants have acted or refused to act on grounds generally applicable to the members of the Nationwide Injunctive Relief Class and the State Law Class, making injunctive and corresponding declaratory relief appropriate with respect to these classes as a whole pursuant to Federal Rule of Civil Procedure, Rule 23(b)(2).

## CLAIMS FOR RELIEF

### A.    VIOLATION OF THE SHERMAN ACT

**COUNT 1**
**VIOLATION OF 15 U.S.C. § 1**
**(On behalf of the Nationwide Injunctive Relief Class)**

145.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

146.    From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for crude oil and HHO in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

147.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil and HHO.

148.    The combination and conspiracy alleged herein has had the following effects, among others:

(a)    Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for crude oil sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

(c)    Those who purchased HHO indirectly from Defendants and their coconspirators have been deprived of the benefits of free and open competition, and paid artificially high prices for HHO.

149.    Plaintiffs and members of the Nationwide Injunctive Relief Class have been injured and will continue to be injured in their businesses and property by paying more for HHO purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

150.    Plaintiffs and members of the Nationwide Injunctive Relief Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**B.    VIOLATIONS OF STATE ANTITRUST, UNFAIR COMPETITION, AND CONSUMER PROTECTION LAWS**

151.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

152.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

153.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes; exchanging competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

154.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the State Law Class were deprived of free and open competition and paid more to purchase HHO than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

155.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

156.    Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

157.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust, unfair competition, and consumer protection statutes.

158.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 2: ALABAMA
**(On behalf of Members of the State Law Class That Purchased HHO in Alabama)**

159.    Due to Defendants' unlawful conduct, (1) competition for crude oil and HHO was restrained, suppressed, and eliminated within Alabama; (2) HHO prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

### COUNTS 3 & 4: ARIZONA
**(On behalf of Members of the State Law Class That Purchased HHO in Arizona)**

160.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout Arizona; (2) prices of HHO in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

161.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

162.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 5 & 6: CALIFORNIA**
**(On behalf of Members of the State Law Class That Purchased HHO in California)**

163.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout California; (2) HHO prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each Defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of domestic shale oil. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of crude oil and HHO. As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

165.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 7 & 8: COLORADO**
**(On behalf of Members of the State Law Class That Purchased HHO in Colorado)**

166.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout Colorado; (2) HHO prices in the State

44

of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

167.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4-101, *et seq.*

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq*. and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

<u>**COUNT 9: CONNECTICUT**</u>
**(On behalf of Members of the State Law Class That Purchased HHO in Connecticut)**

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout Connecticut, and (2) HHO prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq*

<u>**COUNTS 10 & 11: DISTRICT OF COLUMBIA**</u>
**(On behalf of Members of the State Law Class That Purchased HHO in District of Columbia)**

170.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminate throughout the District of Columbia; (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased HHO in the District of Columbia, paid supracompetitive, artificially inflated prices for HHO. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

171.    Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

172.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 12 & 13: FLORIDA
**(On behalf of Members of the State Law Class That Purchased HHO in Florida)**

173.    Through their actions and actions of co-conspirators, crude oil and HHO prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the HHO market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the Class, including those who purchased HHO in the State of Florida, paid supracompetitive, artificially inflated prices for HHO. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

174.    Defendants have violated the FLA. STAT. §542.15 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under FLA. STAT. §542.15 *et seq*.

175.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 14: HAWAII
**(On behalf of Members of the State Law Class That Purchased HHO in Hawaii)**

176.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions. *See* HAW. REV. STAT. §§480-4, 480-13.  Through Defendants' actions and the actions of their co-conspirators, HHO prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Hawaii.  Plaintiffs and members of the Class, including those who resided in the State of Hawaii and

purchased HHO in Hawaii, paid supracompetitive, artificially inflated prices for their HHO. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

## COUNTS 15 & 16: ILLINOIS
### (On behalf of Members of the State Law Class That Purchased HHO in Illinois)

177.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil and HHO markets was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

178.    Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

179.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq,* and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute

## COUNT 17: IOWA
### (On behalf of Members of the State Law Class That Purchased HHO in Iowa)

180.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) HHO prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

1

### COUNT 18: KANSAS
### (On behalf of Members of the State Law Class That Purchased HHO in Kansas)

2

181.    Defendants have entered into an unlawful agreement in restraint of trade in violation of

3

KAN. STAT. ANN. §50-101 *et seq*. Defendants' combinations or conspiracies had the following effects:

4

(1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the

5

State of Kansas; (2) HHO prices in the State of Kansas were raised, fixed, maintained, and stabilized at

6

artificially high levels; and (3) individuals have been deprived of free and open competition. During the

7

Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly,

8

Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et*

9

*seq*.

10

### COUNT 19: MAINE

11

### (On behalf of Members of the State Law Class That Purchased HHO in Maine)

12

182.    Defendants have entered into an unlawful agreement in restraint of trade in violation of

13

ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price

14

competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of

15

Maine; and (2) HHO prices in the State of Maine were raised, fixed, maintained, and stabilized at

16

artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine

17

commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under ME. STAT.

18

TIT. 10, §1104.

19

### COUNTS 20 & 21: MARYLAND

20

### (On behalf of Members of the State Law Class That Purchased HHO in Maryland)

21

183.    Defendants' combinations or conspiracies detrimentally affected the price competition in

22

the State of Maryland for crude oil and HHO by restraining, suppressing, and eliminating competition.

23

Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized HHO prices in the State

24

of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially

25

affected Maryland commerce.

26

27

28

**COUNTS 22 & 23: MICHIGAN**
**(On behalf of Members of the State Law Class That Purchased HHO in Michigan)**

184.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

185.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH.COMP. LAWS §445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

186.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 24 & 25: MINNESOTA**
**(On behalf of Members of the State Law Class That Purchased HHO in Minnesota)**

187.    Through their actions and actions of co-conspirators, HHO prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition in the markets for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Minnesota.  Plaintiffs and members of the Class, including those who resided in the State of Minnesota and purchased HHO there, paid supracompetitive, artificially inflated prices for HHO.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

188.    Defendants have violated the MINN. STAT. §325D.49 *et seq*., through their anticompetitive actions.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

189.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Minn. Stat. Minn. Stat. §325d.43-48 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 26: MISSISSIPPI**
**(On behalf of Members of the State Law Class That Purchased HHO in Mississippi)**

190.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq*. *See* Miss. Code Ann. §75-57-63. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-57-63.

**COUNTS 27 & 28: NEBRASKA**
**(On behalf of Members of the State Law Class That Purchased HHO in Nebraska)**

191.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska.  During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

192.    Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

193.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 29 & 30: NEVADA**
**(On behalf of Members of the State Law Class That Purchased HHO in Nevada)**

194.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Nevada; (2) HHO prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

195.     Defendants violated the Nev. Rev. Stat. Ann. §598A.210 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq*. Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

196.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 31 & 32: NEW HAMPSHIRE
**(On behalf of Members of the State Law Class That Purchased HHO in New Hampshire)**

197.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil and HHO market by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized HHO prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

198.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

199.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 33 & 34: NEW MEXICO
**(On behalf of Members of the State Law Class That Purchased HHO in New Mexico)**

200.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for crude oil and HHO by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained and stabilized HHO prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

201.    Defendants violated the N.M. STAT.ANN. §57-1-1 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

202.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 35: NEW YORK**
**(On behalf of Members of the State Law Class That Purchased HHO in New York)**

203.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the markets for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of New York, and (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

**COUNT 36: NORTH CAROLINA**
**(On behalf of Members of the State Law Class That Purchased HHO in North Carolina)**

204.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the markets for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) HHO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq.*

1

### COUNT 37: NORTH DAKOTA
### (On behalf of Members of the State Law Class That Purchased HHO in North Dakota)

2

205.    Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq*. through their

3

anticompetitive actions. Through their actions and actions of co-conspirators, HHO prices in the State of

4

North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring

5

Plaintiffs and the Class. Throughout the Class Period, price competition in the markets for crude oil and

6

HHO was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiffs and

7

members of the Class, including those who resided in the State of North Dakota and purchased HHO

8

there, paid supracompetitive, artificially inflated prices. During the Class Period, Defendants' illegal

9

conduct substantially affected commerce in the State of North Dakota. Accordingly, Plaintiffs and

10

members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq*.

11

12

### COUNTS 38 & 39: OREGON
### (On behalf of Members of the State Law Class That Purchased HHO in Oregon)

13

206.    Defendants' combinations or conspiracies had the following effects: (1) price competition

14

for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Oregon; (2)

15

HHO prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels;

16

and (3) individuals have been deprived of free and open competition. During the Class Period,

17

Defendants' illegal conduct substantially affected the State of Oregon commerce.

18

207.    Defendants have entered into an unlawful agreement in restraint of trade in violation of

19

OR. REV. STAT. §646.725 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief

20

available under OR. REV. STAT. §646.725 *et seq*.

21

208.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

22

violation of Or. Rev. Stat. §646.605 *et seq*., and, accordingly, Plaintiffs and members of the Class seek

23

all relief available under that statute.

24

25

### COUNT 40 & 41: RHODE ISLAND
### (On behalf of Members of the State Law Class That Purchased HHO in Rhode Island)

26

209.    Defendants' combinations or conspiracies detrimentally affected price competition in

27

the crude oil and HHO markets in the State of Rhode Island by restraining, suppressing, and eliminating

28

competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized HHO prices

in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

210.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq*. Accordingly, Plaintiffs and Members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

211.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 42 & 43: SOUTH DAKOTA
### (On behalf of Members of the State Law Class That Purchased HHO in South Dakota)

212.    Through their actions and actions of co-conspirators, HHO prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the markets for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased HHO there, paid supracompetitive, artificially inflated prices for their HHO.

213.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq*., through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

214.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 44: TENNESSEE
### (On behalf of Members of the State Law Class That Purchased HHO in Tennessee)

215.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of HHO, a tangible good, was restrained, suppressed, and

eliminated throughout the State of Tennessee; (2) prices for HHO, a tangible good, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq.*

## COUNT 45: UTAH
### (On behalf of Members of the State Law Class That Purchased HHO in Utah)

216.    Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected price competition in the crude oil and HHO markets in the State of Utah by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized HHO prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq.*

## COUNT 46: VERMONT
### (On behalf of Members of the State Law Class That Purchased HHO in Vermont)

217.    Defendants combinations or conspiracies had the following effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated throughout the State of Vermont; (2) HHO prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Injunctive Relief Class and State Law Class defined herein, respectfully request that this Court:

A.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiffs and their attorneys to represent the Nationwide Injunctive Relief Class and State Law Class.

B.    Adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above.

C.    Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

D.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the State Law Class for treble the amount of damages sustained by Plaintiffs and the State Law Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law.

E.    Grant such other and further relief as the Court deems just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

218.    Plaintiffs hereby demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), for all claims and issues so triable.

Respectfully submitted,

**LAW OFFICE OF ANDREW M. LEAVITT, ESQ.**

Dated: January 29, 2024

By:    /s/ *Robert F. Purdy*
        Robert F. Purdy (NV Bar No. 6097)
        633 South Seventh Street
        Las Vegas, NV 89101
        Telephone: (702) 382-2800
        Facsimile: (702) 382-7438
        Robert.Purdy@andrewleavittlaw.com

        *Local Counsel for Plaintiffs and the Proposed*
        *Classes*

        Matthew W. Ruan
        Douglas A. Millen
        Michael E. Moskovitz
        Nia-Imara Binns
        **FREED KANNER LONDON**
        **& MILLEN LLC**
        100 Tri-State International, Suite 128
        Lincolnshire, IL 60069
        Telephone: (224) 632-4500
        mruan@fklmlaw.com
        dmillen@fklmlaw.com
        mmoskovitz@fklmlaw.com
        nbinns@fklmlaw.com

        Kimberly A. Justice
        Jonathan M. Jagher
        **FREED KANNER LONDON**
        **& MILLEN LLC**
        923 Fayette Street
        Conshohocken, Pennsylvania 19428
        Telephone: (610) 234-6486
        kjustice@fklmlaw.com
        jjagher@fklmlaw.com

        Jonathan M. Shapiro
        **AETON LAW PARTNERS LLP**
        311 Centerpoint Drive
        Middletown, Connecticut 06475
        Telephone: (860) 724-2160
        jms@aetonlaw.com

        *Counsel  for Plaintiffs and the Proposed Classes*